T.C. Memo. 2014-214

UNITED STATES TAX COURT

BRUCE A. HAUPTMAN, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 29857-07L, 29868-07L.      Filed October 9, 2014.

<u>Donald Jay Pols</u>, for petitioner.

<u>Shawna A. Early</u>, for respondent.

MEMORANDUM OPINION

JACOBS, <u>Judge</u>:  Pursuant to section 6330(d)(1),[1] petitioner seeks review of

the determination by the Internal Revenue Service (IRS or respondent) to proceed

_____

[1]Unless otherwise indicated all section references are to the Internal Revenue Code in effect at all relevant times, and all Rule references are to the Tax Court Rules of Practices and Procedure.

**[\*2]** with collection of petitioner's unpaid Federal income tax liabilities for 1992, 1993, 1994, 1995, and 1996 (years involved) by way of levy. The merits of the underlying tax liabilities are not at issue. The issue for decision is whether the IRS abused its discretion in rejecting petitioner's offer-in-compromise. For the reasons set forth <u>infra</u>, we hold that the IRS did not.

The parties have submitted these consolidated cases fully stipulated under Rule 122.[2] The parties' stipulation of facts, with accompanying exhibits, is incorporated by this reference.

Petitioner resided in Iowa at the time he filed his petitions.

<u>Background</u>

Petitioner failed to timely file Federal income tax returns for the years involved; as a consequence the IRS prepared substitutes for returns pursuant to section 6020(b). Petitioner subsequently filed untimely Federal income tax returns[3] but failed to pay the full amounts of tax shown as due. Respondent

---

[2]These cases were consolidated for purposes of trial, briefing, and opinion pursuant to Rule 141(a). Docket No. 29857-07L relates to 1992, 1993, and 1994; docket No. 29868-07L relates to 1995 and 1996.

[3]Petitioner filed untimely joint returns for 1992 and 1993 with his then, but now former, wife, Anne Hauptman. He filed an untimely return for 1994 on the basis of married filing separately. He filed untimely joint returns for 1995 and 1996 with his then and current wife, Danielle Hauptman.

[*3] assessed the amounts self-reported on the untimely returns as well as penalties as follows: tax and penalties for 1992 and 1993 were assessed on April 7, 1997; tax and penalties for 1994 were assessed on May 19, 1997; tax and penalties for 1995 were assessed on December 8, 1997; and tax and penalties for 1996 were assessed on November 24, 1997. The IRS also began levying on petitioner's property. In response, petitioner began submitting offers-in-compromise, the last of which is the subject of this proceeding. As of March 30, 2007, petitioner's unpaid income tax liabilities for the years involved approximated $13 million.

Respondent issued two separate final notices of intent to levy (levy notices), one for 1992, 1993, and 1994 and another for 1995 and 1996, to petitioner on February 28, 2007. On March 29, 2007, petitioner filed two separate Forms 12153, Request for a Collection Due Process or Equivalent Hearing (section 6330 hearing), one for 1992, 1993, and 1994 and another for 1995 and 1996. On November 19, 2007, the Milwaukee Appeals Office issued two separate notices of determination sustaining the proposed levy action. On December 19, 2007, petitioner filed two petitions with this Court (one for 1992, 1993, and 1994 and another for 1995 and 1996) seeking review of the determinations of the Milwaukee Appeals Office.

**[*4]** I.     Petitioner's Background

During the years involved petitioner was a successful investment consultant. He began his investment career in 1976 with Merrill Lynch & Co. in New York City as a account executive. He later worked at Bache & Co. and Butcher & Singer. In 1984 he founded B. Hauptman & Associates, LLC (BHA), a private investment management firm providing advice to high net worth individuals, pension funds, and institutions. From 1985 through 1988 while managing BHA petitioner held a seat on the Chicago Mercantile Exchange, trading in the S&P 500 futures pit.

In 1989 BHA formed Juniper Capital Management, Inc., later renamed Genesis Capital Fund, LP (Genesis or the fund), a limited partnership. Genesis employed various hedged investment strategies in managing client funds. Genesis Management was formed to be the general partner of Genesis. Petitioner, through his 100% ownership of Georgica Pond, Ltd., an S corporation (Georgica Pond), owned 60% of Genesis Management.

Genesis began operations on December 6, 1989, with $5.1 million under management; by 1993 the amount under management grew to, and peaked at, $179 million. From that point onward the fund sustained a decline in the amount under

[*5] management, which affected the earnings of Genesis Management. Genesis ceased operations at the end of 1999. From 1997 through 2002 BHA sustained a dramatic decline in revenues to the point where it began to experience losses, forcing petitioner to personally fund the operations of BHA. By 2006 the number of BHA's full-time employees had declined from 14 to 1.

II.    Petitioner's Offers-in-Compromise

Petitioner's first offer-in-compromise was made in August 1997, his second was made in March 1998, and a third offer was made in July 2005. The first two offers were rejected as inadequate; the third offer was returned as "solely to delay collection activity."

Petitioner submitted the offer-in-compromise at issue in this matter, his fourth, by submitting a Form 656, Offer in Compromise, on February 10, 2010. He offered to settle his outstanding Federal income tax liabilities for $500,000. The offer was based on doubt as to collectibility. The required 20% of the amount of the offer (i.e., $100,000) was sent with the Form 656. Petitioner stated he would pay the balance (i.e., $400,000) within four months of IRS acceptance and that the funds would come from a third party.

Before filing Form 656 petitioner filed Form 433-A, Collection Information Statement for Wage Earners and Self-Employed Individuals, and several Forms

**[\*6]** 433-B, Collection Information Statement for Businesses. Petitioner reported a monthly income of $15,284 and personal monthly expenses of $10,873.55 on Form 433-A.

Petitioner's case was assigned to Offer Specialist R. Taylor. Offer Specialist Taylor reviewed petitioner's financial information, including documents presented with petitioner's offers-in-compromise. He compared these documents with financial information he had received from third parties[4] and determined that petitioner had understated the value of his property and businesses by as much as $13 million. Offer Specialist Taylor stated the following in a report he prepared: (1) petitioner's personal expenses were primarily paid by Georgica Pond; (2) Georgica Pond paid petitioner's and his former wife's personal credit card bills, personal utility bills, personal mortgage payments and property taxes; and (3) the 20% deposit of $100,000 paid with petitioner's $500,000 offer-in-compromise came from Georgica Pond. Petitioner does not deny the truth of these statements.

---

[4]For example, in response to a summons, Central State Bank provided a financial statement that petitioner had submitted to the bank when he sought a $350,000 loan to be used to settle his outstanding Federal income tax liabilities. Petitioner later asserted to Settlement Officer Randy J. Allen that he "puffed up the figures." See infra.

**[*7]**  Offer Specialist Taylor reviewed petitioner's tax history and observed that petitioner had filed 27 Appeals cases regarding his outstanding tax liabilities.  In reviewing petitioner's financial information, Offer Specialist Taylor determined that petitioner had realized millions of dollars in gains from stock transactions but had chosen to reinvest the assets and make substantial charitable contributions rather than paying his outstanding tax liabilities.[5]

In a fax dated August 18, 2011, sent to Settlement Officer Curtis Megyesi (who was then assigned to the cases, see infra) petitioner acknowledged that he had intentionally failed to pay his outstanding tax liabilities, believing all parties would be better served if he used funds for investment.  The fax stated:

> When you are down 12 runs in the ninth inning bunting is not a realistic option if you want to finally resolve the issue.  It was hoped and expected that such investments would provide the means to pay all the taxes due. * * * If taxes and penalties equaled in excess of $10 million and I had $3 million in assets then the IRS would take all of the funds and I would still be left with a huge tax problem and have no means to invest in hopes of paying the balance due.

Petitioner's "conviction was that all that was needed was one good year and the ability to pay all taxes due would be achieved."  That conviction was never justified as petitioner never had that "one good year".

---

[5]By June 22, 2010, the date of Offer Specialist Taylor's report, petitioner's outstanding tax liabilities for the years involved totaled approximately $15.5 million.

**[*8]** In his report Offer Specialist Taylor concluded that petitioner lived a "lavish lifestyle", petitioner had not reported income for several years, and petitioner's personal expenses had been paid by his companies. Offer Specialist Taylor calculated that petitioner's reasonable collection potential was $3,329,508. Offer Specialist Taylor's report concludes that "[w]ith such an egregious history of non-compliance with paying his required tax, it would be detrimental to the interests of fair tax administration to accept an offer from this individual."

Offer Specialist Taylor's report was reviewed by Compliance Manager, OIC, Terrie Miller. She concurred with Offer Specialist Taylor's rejection of petitioner's $500,000 offer as not in the best interest of the Government. The rejection of petitioner's offer was referred to the San Bernardino, California, Appeals Office for an independent review. That office concurred with Offer Specialist Taylor.

On August 12, 2010, the IRS sent petitioner SB Letter 238 (AOIC) informing him that his offer-in-compromise had been rejected as not being in the best interest of the Government and that he was entitled to contact the Appeals Office within 30 days from the date of the letter. Petitioner timely filed an appeal. On October 12, 2010, petitioner's appeal was assigned to Settlement Officer Randy J. Allen of the Peoria, Illinois, Appeals Office.

[*9]   On April 6, 2011, Settlement Officer Allen sent petitioner a letter in which he calculated the minimum offer amount acceptable to the IRS to be $3,468,951. The minimum offer amount was based on the value of petitioner's businesses, particularly Georgica Pond. The most valuable asset of Georgica Pond was a $2,596,885 receivable arising from a series of loans from Georgica Pond to BHA. Petitioner disagreed with Settlement Officer Allen's calculation. Petitioner maintained the receivable was worthless because BHA was not in a position to repay the loan. Settlement Officer Allen stated in the IRS case activity record that he disagreed with petitioner, noting that the loans were made when petitioner's taxes were due and that the loan funds could have been used to settle petitioner's outstanding tax liabilities. Settlement Officer Allen later wrote in the IRS case activity record that both Georgica Pond and BHA remained operating concerns and that he assumed both were in business to make a profit.

On May 13, 2011, in response to new information petitioner provided, Settlement Officer Allen reduced petitioner's reasonable collection potential to $2,900,000. At a time not in the record, petitioner's case was reassigned from Settlement Officer Allen to Settlement Officer Curtis M. Megyesi. Settlement Officer Megyesi contacted petitioner and his representative, Alvin Brown. The IRS case activity record reveals that Settlement Officer Megyesi and petitioner

[*10] met and discussed petitioner's offer.  Petitioner was asked how he was able to pay his living expenses.  Petitioner replied that he supported himself with proceeds of bank loans and money borrowed from individuals.  Settlement Officer Megyesi asked petitioner why he donated $400,000 to the Maharishis of Iowa when his offer-in-compromise was pending.  Petitioner replied he was confident that an investment he then was concluding would permit him to pay his taxes in full.

Settlement Officer Megyesi raised concerns as to discrepancies between the stated values of assets set forth in financial information petitioner provided the IRS and the stated values of the same assets set forth in petitioner's loan application with Central State Bank.  See supra note 4.  Petitioner replied that the figures submitted on the loan application were "puffed up."  Settlement Officer Megyesi, however, believed the asset values set forth in the loan application were accurate and that petitioner had understated the value of his assets as set forth in the IRS forms.

Settlement Officer Megyesi also reviewed copies of various promissory notes evidencing alleged loans to petitioner and his businesses.  He observed that some of the notes identified the obligators only by their first names, that the lenders had not signed several of the notes, and that the notes did not contain any

[*11] default language. Settlement Officer Megyesi calculated the amount of the loans to be $1,335,000. He expressed concern that the only collateral for these loans was petitioner's equity in an investment company which had not yet begun operating (B. Hauptman Holdings, LLC). Settlement Officer Megyesi's review showed a substantial part of the borrowed money was deposited into the bank account of B. Hauptman Holdings, LLC. Settlement Officer Megyesi was able to track a $500,000 tranche of loan proceeds deposited into the account of B. Hauptman Holdings, LLC. Thereafter, $247,000 was transferred to Georgica Pond's bank account. The money was used to pay BHA expenses as well as petitioner's personal expenses. Settlement Officer Megyesi notes in the case activity record that

> [t]he money has been spent. I didn't see where Mr. Hauptman [petitioner] invested the money to make money. I don't know how he will pay it back. The loan is secured with Mr. Hauptman's personal guarantee and the equity in B. Hauptman Holdings. Again, as far as I knew from prior conversations with Mr. Hauptman this company did not exist not [sic] does it have any assets. * * * In other words, Mr. Hauptman states, this company does not exist yet it is able to transfer half a million dollars to a company he calls his nominee [Georgica Pond].

Settlement Officer Megyesi reviewed petitioner's business dealings. The IRS case activity record reveals an individual named Paul Winer paid petitioner or Grand Teton Capital Management, LLC, more than $50,000 on July 26, 2011, for

[*12] future investment advisory services to be provided over the subsequent five years, with services to be limited to 25 hours per year. In the IRS activity record Settlement Officer Megyesi expressed concern as to this transaction, observing:

> Wouldn't it be better to pay by the hour when needed? Could he pay only a year at a time? What about a default is [sic] service? The agreement contains no default clause. What if Mr. Winer is not happy with the service after one year? Again, it doesn't seem likely that someone would enter into this type of agreement that highly favors the other party.

On December 20, 2011, Settlement Officer Megyesi spoke with petitioner's representative, Alvin Brown. Settlement Officer Megyesi asked why the loans were made to B. Hauptman Holdings, LLC, a company not yet in operation. Mr. Brown agreed the loans did not make sense, but he assumed the loans were to fund the soon-to-be operational company.

Settlement Officer Megyesi reviewed the $500,000 tranche of loan proceeds he had traced with Mr. Brown. Mr. Brown agreed that it appeared petitioner was using the borrowed funds for personal use. Mr. Brown was unable to explain the incomplete promissory notes, and he agreed that the $50,000 payment by Mr. Winer to petitioner was "a bad deal." Mr. Brown stated that he would contact petitioner and speak with Settlement Officer Megyesi again. The record does not reveal that any such discussion occurred.

[*13] Because the amount of petitioner's offer-in-compromise was substantially less than $2,900,000, the amount that Settlement Officer Allen had determined to be petitioner's reasonable collection potential, the Appeals Office sustained the rejection of petitioner's $500,000 offer-in-compromise.

Settlement Officer Megyesi prepared a detailed Appeals Case Memorandum (ACM) on January 12, 2012. In the ACM Settlement Officer Megyesi stated that the rejection of petitioner's offer-in-compromise was based on the provisions of Policy Statement P-5-100. Specifically, he (as well as Settlement Officer Allen) determined that acceptance of the offer was not in the best interest of the Government, in part because petitioner was not reporting all the income he was earning. The ACM set forth a detailed review of the facts of the case as established by various IRS offer specialists and settlement officers, including a calculation of petitioner's assets, the values of which Settlement Officer Megyesi believed to be substantially greater than the asset values to which petitioner had admitted.

The ACM noted that petitioner had paid no tax for 10 years because the income he reported was offset by claimed losses. The ACM stated that petitioner had established layers of business entities, some to make investments, others to manage them, the effect of which was to divert income and make it difficult for the

**[*14]** IRS to determine the income attributable to petitioner. The ACM listed six

examples of such layering. The memorandum stated:

> It appears that through this layering of entities, Mr. Hauptman is able
> to divert income from himself to business entities, all of which could
> be considered nominees. Because his investment opportunities are
> continuous in nature, he is able to offset any reported income with
> losses from one or more of his other investment opportunities. It can
> be understood how this could occur on any given year but is difficult
> to understand how someone could sustain enough losses to overcome
> income over a ten year period and still have money to invest.
> Eventually, no money would be left to invest. Based on the
> information reviewed, it is believed that not all income is being
> reported. It also does not appear that all of the LLC's [i.e., the
> business entities] are properly reporting K-1 income to Mr. Hauptman
> or to each other. Review of the administrative file documents that
> money readily flows between the LLC entities and many of Mr.
> Hauptman's personal expenses are paid by one or more of the LLC's.

The ACM examined $1,335,000 in loans made to petitioner's companies

and reviewed the complex series of intercompany transactions through which

petitioner's personal expenses were paid. The ACM stated: "These distributions

are not the debts of B. Hauptman Holdings [i.e., petitioner's new company]. This

provided further evidence of the co-mingling on money between entities. * * *

What did they do with the money? This example further verifies that income is

not being properly reported."

On July 2, 2012, respondent sent petitioner two supplemental notices of

determination (supplemental notices) rejecting petitioner's offer-in-compromise

**[\*15]** and sustaining the conclusions reached previously in the levy notices. The supplemental notices essentially repeated the findings set forth in the ACM. The supplemental notices stated that all legal and procedural requirements had been met and that the levy appropriately balanced (1) the need for efficient collection of petitioner's unpaid Federal income tax liabilities with (2) petitioner's concern that the collection action be no more intrusive than necessary.

Discussion

I.    Introduction

These cases involve a review of respondent's determination to proceed with collection of petitioner's unpaid Federal income tax liabilities for 1992, 1993, 1994, 1995, and 1996 by way of levy. Section 6330 hearings concerning levies are conducted in accordance with section 6330(c). At the section 6330 hearing a taxpayer may raise any relevant issues relating to the unpaid tax, including spousal defenses, challenges to the appropriateness of the collection action, and offers of collection alternatives. A taxpayer may challenge the existence or amount of the underlying tax liability only if he/she did not receive a notice of deficiency or otherwise have an opportunity to dispute the liability. Sec. 6330(c)(2)(B); sec. 301.6330-1(e)(3), Q&A-E2, Proced. & Admin. Regs. Petitioner does not in this proceeding challenge the existence or amounts of his underlying tax liabilities.

**[*16]** After the Commissioner issues a notice of determination, a taxpayer may petition this Court for review thereof. Sec. 6330(d)(1). The Court's review of the Commissioner's determination is subject to the provisions of section 6330. Because petitioner does not dispute the underlying tax liabilities for the years involved, we review respondent's determination for abuse of discretion. See Sego v. Commissioner, 114 T.C. 604, 610 (2000); Goza v. Commissioner, 114 T.C. 176, 181-182 (2000). An abuse of discretion is defined as any action that is unreasonable, arbitrary or capricious, clearly unlawful, or lacking a sound basis in fact or law. Thor Power Tool Co. v. Commissioner, 439 U.S. 522, 532-533 (1979); Woodral v. Commissioner, 112 T.C. 19, 23 (1999).

II.     Petitioner's Arguments

Petitioner first argues that the IRS erred by rejecting his offer-in-compromise on the premise that because he is not or has not been in compliance with his filing and payment obligations, it would not be in the best interest of the Government to accept the offer-in-compromise. Petitioner maintains (1) such a determination is contrary to regulations and published IRS policy statements, and (2) the record does not support the conclusion that petitioner is not in compliance or has in the past been so. Second, petitioner asserts the IRS erred in adding dissipated assets to the calculation of his reasonable collection potential. Third,

**[\*17]** petitioner asserts the IRS erred by using asset valuations that have no basis in fact and are unsupported by the record. And, fourth, petitioner asserts the IRS erred by failing to use applicable public guidance to calculate the value of his potential future income.

III.   Respondent's  Rejection of Petitioner's Offer-in-Compromise as Not in the Best Interest of the Government

The Commissioner may compromise any civil tax case. Sec. 7122(a); sec. 301.7122-1(a)(1), Proced. & Admin. Regs. An outstanding tax liability may be compromised on one of three grounds: (1) doubt as to liability, (2) doubt as to collectibility, and (3) promotion of effective tax administration. Sec. 301.7122-1(b), Proced. & Admin. Regs.

Petitioner offered to compromise his outstanding tax liabilities for the years involved on the basis of doubt as to collectibility. The Commissioner may compromise a tax liability for doubt as to collectibility when "the taxpayer's assets and income are less than the full amount of the liability." Sec. 301.7122-1(b)(2), Proced. & Admin. Regs. The decision to accept or reject such an offer to compromise, as well as the terms and conditions agreed to, is in the discretion of the Commissioner. Id. para. (c)(1). We do not conduct an independent review of what would be an acceptable offer-in-compromise, and we give due deference to

[*18] the Commissioner's decision.  Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Woodral v. Commissioner, 112 T.C. at 23.

The Commissioner is guided in his consideration of offers-in-compromise by regulations and policies aimed at similarly treating taxpayers in similar situations and by considering special facts and circumstances that may be present in each case.  Section 301.7122-1(f)(3), Proced. & Admin. Regs., provides that "[n]o offer to compromise may be rejected solely on the basis of the amount of the offer without evaluating that offer under the provisions of this section and the Secretary's policies and procedures regarding the compromise of cases."

The Commissioner's general policy is to accept an offer-in-compromise when it is unlikely that the tax liability can be collected in full and the amount offered reasonably reflects the taxpayer's collection potential.  However, the Internal Revenue Manual (IRM) states that in certain instances, the Commissioner may reject such an offer-in-compromise if acceptance would not be in the best interest of the Government.  IRM pt. 5.8.7.7.1(1) (May 10, 2011), provides that

> [a]n offer rejection may also be based on a determination that acceptance of the specific offer at hand is not in the best interest of the government as discussed in Policy Statement P-5-100 (IRM 1.2.14.1.17).  Rejections under this provision should not be routine and should be fully supported by the facts outlined in the rejection

**[\*19]** narrative. Offers rejected under this section require the review and approval of the second level manager; that is, Territory Manager for the field of Department Manager for COIC.

Policy Statement P-5-100 states, in pertinent part, that

> [t]he success of the * * * [compromise] program will be assured only if taxpayers make adequate compromise proposals consistent with their ability to pay and the Service makes prompt and reasonable decisions. Taxpayers are expected to provide reasonable documentation to verify their ability to pay. The ultimate goal is a compromise that is in the best interest of both the taxpayer and the Service. * * *

Policy Statement P-5-100, IRM pt 5.8.1.1.3 (Mar. 16, 2010).

IRM pt. 5.8.7.7.1(2) provides the following as an example of a situation that may warrant rejection of an offer-in-compromise as not being in the best interest of the Government: "Recent compliance satisfies offer processability criteria; however, the taxpayer has an egregious history of past noncompliance and our analysis of his current finances reveals that it will be highly unlikely the taxpayer will be able to remain in compliance during the offer period."

Petitioner does not claim that respondent failed to follow the procedures set forth in the IRM. Instead, petitioner challenges respondent's application of IRM pt. 5.8.7.7.1 and Policy Statement P-5-100. Petitioner argues that the regulations provide that a taxpayer's history of noncompliance may be used to reject an offer-in-compromise only when the rejection is made based on the promotion of

[*20] effective tax administration under section 301.7122-1(b)(3), Proced. & Admin. Regs.[6] Petitioner argues that there is nothing in the regulations directing or authorizing the Commissioner to promulgate policies that would cause him to reject an offer-in-compromise based on doubt as to collectibility because of a history of noncompliance. Petitioner is incorrect in this assertion.

Policy Statement P-5-100 and the predecessor to IRM pt. 5.8.7.7.1 have previously been relied upon by the Commissioner to guide his determination to reject an offer-in-compromise based on doubt as to collectibility, and we have accepted their validity. See Bennett v. Commissioner, T.C. Memo. 2008-251; Oman v. Commissioner, T.C. Memo. 2006-231. In Bennett, we pointed out that these guidelines "are in the end just that--language guiding the Commissioner's considerations of all the facts and circumstances, as mandated by the regulation that is unquestionably binding, section 301.7122-1(f)(3), Proced. & Admin Regs. That regulation does not compel the Commissioner to accept any particular offer, but to consider the facts and circumstances of the case before him." We believe respondent did consider the facts and circumstances of petitioner's case and that

---

[6]Sec. 301.7122-1(b)(3)(iii), Proced. & Admin. Regs., provides that "[n]o compromise to promote effective tax administration may be entered into if compromise of the liability would undermine compliance by taxpayers with the tax laws."

[*21] respondent has obeyed the requirements of section 301.7122-1(f)(3), Proced. & Admin. Regs.

Bennett and Oman illustrate the operation of the IRM and the Policy Statement. In each case the taxpayer had an "egregious history" of noncompliance, and in each the Commissioner determined that there was a probable likelihood of future noncompliance. Relying on the IRM and the Policy Statement, the Commissioner rejected offers-in-compromise in both cases. In Bennett, we sustained the Commissioner's rejection of the offers-in-compromise because the Commissioner fully considered the facts and circumstances in the case and thoroughly explained his reasoning in the notice of determination.[7]

In Oman, however, we remanded the case to the Appeals Office because the Commissioner's reasoning was unclear as to why it was in the best interest of the Government to reject the offer-in-compromise. In that matter, the Commissioner conceded that the taxpayer's reasonable collection potential was zero, yet the Commissioner still rejected the taxpayer's offer to settle his $170,000 outstanding tax liability for $1,000.

_____

[7]The Commissioner placed the taxpayer in Bennett in currently not collectible status because of her financial condition instead of levying on her property. The Commissioner's analysis indicated that the taxpayer's circumstances might change in the near future and allow for the collection of her delinquent tax.

[*22] Unlike in <u>Oman</u>, in the instant matter there is a fully developed record, expatiating the Commissioner's reasoning. The ACM and the supplemental notices thoroughly discussed the layering of petitioner's business entities, the questionable documentation regarding petitioner's loans, and the use of moneys not for investment purposes, but to pay petitioner's personal expenses. Moreover, the IRS case activity record files detailed Settlement Officer Megyesi's inability to get petitioner or his representative to explain the companies' business transactions. And we are mindful that the amount Settlement Officer Megyesi and Settlement Officer Allen determined to be petitioner's reasonable collection potential, $2,900,000, greatly exceeded petitioner's $500,000 offer-in-compromise.

Settlement Officer Megyesi noted that Georgica Pond held a loan receivable of $2,596,885. He gave cogent reasons as to why the loan receivable should be treated as a collectible (e.g., both businesses remained viable). We do not find Settlement Officer's Megyesi's position to be unreasonable or lacking in a sound basis in fact. Further, we find that Settlement Officer Megyesi had good reason to distrust petitioner's financial statements, for by his own admission petitioner provided false financial statements to third parties when it served his purposes. Thus, we believe the asset valuations used by Settlement Officer Megyesi and Settlement Officer Allen were not unreasonable and had a basis in fact.

**[\*23]** Additionally, the record does not indicate that Settlement Officer Allen (and subsequently Settlement Officer Megyesi) erred by "failing to use applicable public guidance to calculate the value of his potential future income", as petitioner asserts. See supra p. 17.

Petitioner argues that the record does not support respondent's conclusion that he is not or has not been in compliance in the past with his return filing and tax payment obligations. Petitioner points out that the supplemental notices acknowledged that he timely filed Federal income tax returns for years after the years involved in these cases. Moreover, as petitioner points out, the IRS has not audited or adjusted any of his claimed losses.

Petitioner's argument, however, ignores the fact that he failed to comply with his tax return filing and payment obligations throughout the years involved, a failure due to his desire to use the money for other purposes, rather than an inability to make any tax payments. Moreover, respondent's rejection of petitioner's offer-in-compromise is based in part on a determination that petitioner did not give the IRS complete and accurate information regarding his taxable income. Petitioner's own documentation raises questions as to the intercompany structure of his businesses, payments by those businesses of his personal expenses, and loans ostensibly made to him by his businesses and by others. Indeed,

[*24] petitioner's own representative agreed that certain transactions were "a bad deal" for the other parties. Petitioner failed to provide clarification of these transactions despite IRS requests to do so. And it is not an abuse of discretion to reject a collection alternative and sustain the proposed collection action (i.e., levy) on the basis of a taxpayer's failure to submit requested financial information. Sullivan v. Commissioner, T.C. Memo. 2012-337; see Wright v. Commissioner, T.C. Memo. 2012-24; Huntress v. Commissioner, T.C. Memo. 2009-161. In sum, we find no error in respondent's determination that petitioner's questionable transactions with others call into question petitioner's future compliance.

To conclude, we hold that respondent did not abuse his discretion in rejecting petitioner's offer-in-compromise. We thus hold that respondent may proceed with enforced collection by levy. In reaching our holdings, we have considered all arguments made, and to the extent not mentioned above, we conclude they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decisions will be entered for

respondent.