T.C. Memo. 2008-251


UNITED STATES TAX COURT


LESLIE B. BENNETT, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 22699-05L.                Filed November 6, 2008.


<u>Dean A. Hrbacek</u>, for petitioner.

<u>Susan Greene</u> and <u>Marilyn Ames</u>, for respondent.



MEMORANDUM OPINION


HOLMES, <u>Judge</u>:  Leslie Bennett offered the Commissioner nearly $15,000 to settle her tax debt of more than $110,000.  The Commissioner admits that Bennett's offer is more than ten times what the Commissioner himself calculated to be the amount she could reasonably pay.  But the Commissioner nevertheless refused

her offer, because he wanted to place part of her debt in "currently not collectible" status--letting him try to collect more were her finances to improve. The question is whether his refusal to accept Bennett's offer is an abuse of discretion.

## Background

Bennett failed to file her tax returns from 1997 through 2001. She also failed to pay over the taxes for four quarters between 2000 and 2001 that had been withheld from employees of a company she helped run. In 2003, the Commissioner began an audit and asked Bennett to file the missing tax returns. She did-- filing the missing returns in several batches. She also filed her 2002 return, months after it was due. The return showed that she owed nearly $8,000, but she failed to include any payment with the return. The Commissioner subsequently sent Bennett a notice that he intended to levy upon her property to collect the 2002 tax debt. He later put a lien on her property to secure the payment of both the 2002 income-tax and other tax debts that she owed. Bennett asked for a collection due process (CDP) hearing.

At the hearing, Bennett claimed that she had gotten right with the tax system, promising that she was owed a refund on her 2003 taxes which she would apply to her 2004 taxes. The Commissioner set a deadline for Bennett to provide copies of both her 2003 and 2004 returns, along with proof of payment. Bennett complied, but her 2003 return showed not only that she wasn't

putting in for a refund, but that she actually owed more than $15,000. As with her 2002 taxes, she did not pay.

Bennett also sent the IRS a copy of a check for $5,619, which she said was an estimated payment of her 2004 liability, as well as an offer to compromise her 1996, 1999, 2002, and 2003 income-tax debts and the trust-fund-recovery penalties she still owed for four quarters between 2000 and 2001.[1] This first offer was for $1,500, which the Commissioner promptly rejected as not in the government's best interest. It was also based on a list of income and expenses that the Commissioner concluded were excessive or unverifiable. Bennett responded by submitting more documentation to support her position. After review, the Commissioner sent a counteroffer for $31,756.81.

But then the Commissioner suspended negotiations, having discovered that Bennett's $5,619 estimated tax payment for 2004 never posted--it turned out that Bennett had sent in only a copy of the check and not the check itself. What had happened was that Bennett's mother, who had seemed to be willing to help get

---

[1] Taxes that employers withhold from their employees' wages are known as "trust fund taxes" because they are deemed a special fund in trust for the United States under section 7501(a). Slodov v. United States, 436 U.S. 238, 243 (1978). The Commissioner may collect unpaid employment taxes from a "responsible person" within the company; i.e., someone who was required to pay over the tax. The money that's collected is called a trust-fund-recovery-penalty tax. Sec. 6672. (Unless otherwise indicated, all section references are to the Internal Revenue Code.)

her daughter out of tax trouble, had changed her mind and now would help only if the Commissioner would agree to a single lump-sum payment to discharge all her daughter's tax liability. This was news to the Commissioner; he told Bennett that she could try another offer-in-compromise, but must prove that she had filed her 2004 return and fully paid any tax due.

Bennett accepted this suggestion and in late July 2005, filed her 2004 Form 1040 and fully paid the amount due. Bennett also included proof of a $3,000 estimated tax payment for 2005. And she submitted a second compromise offer of $14,908.81. Following much computational give-and-take between the two parties, the Commissioner tendered a second counteroffer of $54,816. Bennett then won a variety of favorable concessions on various monthly living expenses, leading the Commissioner to recalculate his offer a final time, lowering it to $33,484.81.

The fluidity of these negotiations sprang from the Commissioner's finding that many of Bennett's expenses, including transportation expenses and tuition for her son, were unverifiable or somehow improper. Bennett's leased 2002 Mercedes (which was the largest part of her claimed $820 monthly transportation expense), for instance, was in fact registered to and paid for by her mother. Bennett had agreed to reimburse her mother for the monthly payments by check, but the Commissioner discovered that Bennett's mother had never cashed any of them.

Bennett's claim for $1,000 in monthly tuition costs for her son was likewise undermined when the Commissioner discovered that her mother had paid most of those costs during late 2004 and early 2005.

All of this haggling ultimately went nowhere. Bennett submitted another financial update in late September 2005 showing that her income had dropped to an average of $4,093 in the last seven months while her monthly expenses averaged $4,777. With Bennett now dependent on family loans for living expenses, the Commissioner recommended rejection of her offer in compromise and placement of her 2002 debt on "currently not collectible" status. Based on this determination, the Commissioner sent her a notice of determination stating that he would indefinitely suspend his collection activities for all years pending an improvement in Bennett's finances.

The Commissioner's notice of determination cited Internal Revenue Manual (IRM) Part 5.8.7.6(5) (Sept. 1, 2005), which states that a "rejection may also be based on a determination that acceptance of the [offer] is not in the 'best interest of the government' per policy statement P-5-100." The Commissioner also cited language from the IRM authorizing rejection when a taxpayer has an egregious history of noncompliance and a probable likelihood of noncompliance in the future. He stated as well that "rejection of the offer was also based on the time left on

the collection statutes, the taxpayer's age, earning capability over the next several years, and the fact that her business has the ability to generate a large profit in the near future."

Bennett timely filed an appeal of the Commissioner's rejection and his decision to place her 2002 debt in currently-not-collectible status. She argues that because her offer of $14,908.81 exceeds her $1,468.81 collection potential, it is in the government's best interest, according to the Commissioner's own policy statement, and so the Commissioner had no justification to reject it.

Discussion

Tax debts are typically settled in one of three ways: The Commissioner may allow a taxpayer to pay his tax debt over time via an installment agreement; he may declare the debt "currently not collectible" and take no collection action until and unless the taxpayer's finances improve; or, he may accept a taxpayer's offer to compromise for less than the full debt owed. IRM pt. 5.14.1.1 (July 12, 2005), 5.16.1.1 (Sept. 19, 2005), and 5.8.1.1.3 (Sept. 1, 2005).

The parties agree that the question in this case is whether the Commissioner abused his discretion in rejecting Bennett's offer and instead classifying her tax debt as currently not collectible. We therefore look to see if the Commissioner's decision was grounded on an error of law or rested on a clearly

erroneous finding of fact, or whether he applied the correct law to fact findings that weren't clearly erroneous but ruled in an irrational manner.  Indus. Investors v. Commissioner, T.C. Memo. 2007-93 (citing United States v. Sherburne, 249 F.3d 1121, 1125-26 (9th Cir. 2001)); see also Cooter & Gell v. Hartmarx Corp., 496 U.S. 384, 402-03 (1990).

The Commissioner is guided in his consideration of offers in compromise by regulations and policies aimed at balancing the values of treating taxpayers in similar situations similarly and considering the special facts and circumstances of each case. Section 301.7122-1(f)(3), Proced. & Admin. Regs., states: "No offer to compromise may be rejected solely on the basis of the amount of the offer without evaluating that offer under the provisions of this section and the Secretary's policies and procedures regarding the compromise of cases."  These policies and procedures are laid out in the IRM.  IRM pt. 5.8.1.1.  The regulations also instruct, "The determination whether to accept or reject an offer to compromise will be based upon consideration of all the facts and circumstances."  Sec. 301.7122-1(c)(1), Proced. & Admin. Regs.

The Commissioner accepts an offer in compromise on one of three bases: doubt as to liability, doubt as to collectibility, or promotion of effective tax administration.  Sec. 301.7122-1(b), Proced. & Admin. Regs.  Bennett put her offer in the doubt-

as-to-collectibility pigeonhole, and we look to the rules on those kinds of offers.

IRM part 5.8.7.6(5) states that offers in compromise are to be evaluated in terms of what is "in the 'best interest of the government' per policy statement P-5-100." That policy, in turn, states the Commissioner will accept offers when "it is unlikely that the tax liability can be collected in full and the amount offered reasonably reflects collection potential."

Bennett believes that this language from policy statement P-5-100, (Jan. 30, 1992), conclusively defines the government's "best interest." And she argues that she meets both of policy statement P-5-100's requirements. First, as the Commissioner admits, her full debt is not collectible. Second, her offer of $14,908.81 not only meets, but greatly exceeds, her collection potential of $1,468.81. Bennett believes these two facts mean her offer is in the government's best interest--and that the Commissioner's refusal to accept it is an abuse of discretion.

Policy statement P-5-100 is not a stand-alone statement, however, but only part of another section of the Internal Revenue Manual: IRM part 5.8.1.1.3(1). IRM part 5.8.1.1.3(3) states: "A Doubt as to Collectibility (DATC) offer amount must equal or exceed a taxpayers (sic) reasonable collection potential (RCP) in order *to be considered for acceptance*." (Emphasis added.) This language, contrary to Bennett's contention, doesn't require that

the Commissioner accept an offer in compromise whenever the amount exceeds the collection potential. Rather, it only establishes grounds for winning *consideration.*

Even policy statement P-5-100 does not draw a bright line-- stating not that the IRS will accept any offer exceeding reasonable collection potential, but only that it will do so when "the amount offered *reasonably* reflects collection potential." It goes on to state that "taxpayers are expected to provide reasonable documentation to verify their ability to pay." And IRM part 5.8.7.6 lists, as one example of an offer in compromise that the Commissioner might reject as not in the best interest of the government, an offer from a taxpayer who "has an egregious history of past noncompliance and our analysis of his current finances reveals that it will be highly unlikely the taxpayer will be able to remain in compliance during the offer period."

The record here also shows that the Commissioner based his determination in part on his finding that there was a possibility that Bennett's circumstances might change in the near future (i.e., before the statute of limitations for collecting her taxes runs out). Because Bennett had so delayed filing her returns, we find no error in the Commissioner's conclusion that there were eight years or more remaining before the statute would run on most of the years in question. We also find no clear error in the Commissioner's conclusion that Bennett had several more years

of earning capability. The Commissioner recognized that her business (a public relations firm) had not been enormously successful, but we note that she had quite low overhead (she ran it out of her home), so we don't find the Commissioner to be clearly erroneous in deciding it had potential to be more successful in the future.

We thus find no abuse of discretion in the Commissioner's determination. Bennett argues, however, that our decision in Oman v. Commissioner, T.C. Memo. 2006-231, supports her argument as a matter of law. In Oman, we also confronted the interplay between IRM part 5.8.7.6(5) and policy statement P-5-100. Oman, with a debt of more than $170,000 and irregular and often poor earnings since a personal financial catastrophe, offered $1,000 to compromise his tax debt. The Commissioner refused the offer as not being in the government's best interest, citing as his reasons Oman's past noncompliance and doubt as to Oman's likelihood of remaining compliant in the future. As in Bennett's case, the Commissioner in Oman cited IRM part 5.8.7.6(5) and its emphasis on past and future compliance as the definition of "best interest." Oman riposted by citing policy statement P-5-100 and arguing that he met its two-part requirement: the debt be currently not collectible, and the offer be greater than the taxpayer's current collection potential.

Bennett claims that in <u>Oman</u>, the Court "analyzed policy statement P-5-100 and IRM pt. 5.8.7.6(5) and concluded, as applied in this case, they appear to be inconsistent regarding the 'best interest of the government.'  The same inconsistency holds true in the current case."  Unfortunately, this is the most favorable contention Bennett can extract from <u>Oman</u>.

<u>Oman</u> in fact led only to a remand for a further hearing, not a decision for the taxpayer.  It offered no firm conclusions resolving the possible conflict between IRM part 5.8.7.6(5) and policy statement P-5-100.  Furthermore, a close reading of our conclusion shows that our main concern with the record to that point was the "unclear" reasoning for the "best interest"-based rejection.  <u>Oman</u>, T.C. Memo. 2006-231.

The Commissioner, on the other hand, compares our facts to those of <u>Oman</u> and points out a crucial difference.  Unlike the "absent" record there, this case boasts a full record that makes the Commissioner's reasoning quite clear.  Because IRM part 5.8.7.6(5) and policy statement P-5-100 are both contained in the Commissioner's manual of policies and procedures, they would seem to hold equal weight.  But both guidelines are in the end just that--language guiding the Commissioner's consideration of all the facts and circumstances, as mandated by the regulation that is unquestionably binding, section 301.7122-1(f)(3), Proced. & Admin. Regs.  That regulation does not compel him to accept any

particular offer, but to consider the facts and circumstances of the case before him.  That is what he did here.

The Commissioner has diligently presented an exhaustive narrative to justify his conclusion that accepting Bennett's offer would be in neither his best interest nor hers.  Given the Commissioner's adherence to statutory prescription, we cannot say that his rejection represents an abuse of discretion.

<u>Decision will be entered for</u> <u>respondent</u>.