T.C. Memo. 2021-34

UNITED STATES TAX COURT

THOMAS L. SIEBERT AND DEBORAH S. SIEBERT, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 25685-15L.                    Filed March 15, 2021.

<u>Glen E. Frost</u> and <u>Rebecca J. Sheppard</u>, for petitioners.

<u>Erin K. Neugebauer</u>, for respondent.

MEMORANDUM OPINION

JONES, <u>Judge</u>:  In this collection due process (CDP) case petitioners seek

review pursuant to section 6330(d)(1)[1] of a determination by the Office of Appeals

———————————

[1]Unless otherwise indicated, all section references are to the Internal
Revenue Code in effect at all relevant times, and all Rule references are to the Tax
Court Rules of Practice and Procedure.  We round all monetary amounts to the

(continued...)

[*2] (Appeals or Appeal Office) of the Internal Revenue Service (IRS) to proceed with a proposed levy action to collect their unpaid Federal income tax liability for the 2013 tax year. Respondent has moved for summary judgment pursuant to Rule 121, contending that there are no disputes of material fact and judgment may be rendered as a matter of law.

For the reasons discussed below, we conclude that the settlement officer did not abuse her discretion in sustaining the proposed collection action. No disputes of material fact remain. Accordingly, we will grant respondent's motion for summary judgment.

Background

The following facts are based on the parties' pleadings and motion papers, including the attached declarations and exhibits.

I.    Petitioners

Petitioners are married and resided in Washington, D.C., when the petition was filed with the Court. Mr. Siebert is an attorney who ran his own law practice. Both petitioners are business owners. Mrs. Siebert is the sole member of Siebert Consulting, and Mr. Siebert is the owner of Siebert Corp. Petitioners timely filed

---

[1](...continued)
nearest dollar.

**[*3]** (with an extension) their 2013 tax return, and the IRS assessed the resulting liability, which petitioners did not pay upon notice and demand.

## II.   IRS Collection Actions

### A.   Notice of Intent to Levy

On April 27, 2015, the IRS sent petitioners a Notice CP90, Notice of Intent to Seize Your Assets and Notice of Your Right to a Hearing.  On May 27, 2015, the IRS timely received petitioners' Form 12153, Request for a Collection Due Process or Equivalent Hearing.  Petitioners indicated they wished to obtain a collection alternative of an offer-in-compromise (OIC), an installment agreement (IA), or currently not collectible (CNC) status.[2]

---

[2]Petitioners also indicated they were eligible for an abatement, but they did not provide information in support of this request.  The IRS presumed that petitioners abandoned their penalty abatement argument.  The record is devoid of any evidence that petitioners argued the issue of abatement, either in the CDP hearing or this proceeding.  It was incumbent upon petitioners to raise this issue, and Appeals did not abuse its discretion by declining to raise this argument sua sponte.  See Ramdas v. Commissioner, T.C. Memo. 2013-104, at *40-*41.  Absent special circumstances, we do not have authority to consider sec. 6330(c)(2) issues that were not raised before Appeals.  See Giamelli v. Commissioner, 129 T.C. 107, 115 (2007); Magana v. Commissioner, 118 T.C. 488, 493-494 (2002).  Consequently, we do not overturn Appeals' determination on the basis of its nonruling.

**[\*4]**  B.      CDP Hearings

         1.      First CDP Hearing

Appeals assigned petitioners' case to Appeals Officer June L. Lee (AO Lee).  In a letter dated July 9, 2015, AO Lee scheduled petitioners' CDP hearing for September 1, 2015, and requested that they provide financial documentation to support their claims by July 30, 2015.  Petitioners failed to provide the requested information to AO Lee before the CDP hearing.

Petitioners did not challenge their underlying liability for the 2013 tax year during the CDP hearing.[3]  However, during the hearing petitioners' representative requested a 14-day extension to provide updated financial documentation to reflect a change in their financial circumstances.  According to petitioners, AO Lee orally granted petitioners' representative an additional 14 days to provide updated financial information.

But AO Lee's case notes reflect that she denied petitioners' request.  AO Lee determined that petitioners did not provide sufficient information before or during the CDP hearing.  On September 10, 2015, Appeals issued the notice of

_____

[3]Notice CP90, dated April 27, 2015, lists the total amount owed for the 2013 tax year as $34,108.

[*5] determination, which sustained the proposed levy action.  Petitioners timely filed their petition in this Court on October 9, 2015.[4]

On August 2, 2016, respondent and petitioners filed a joint motion to remand, and we granted it on August 4, 2016.  The purpose of the remand was to give petitioners the opportunity to submit financial information for consideration of a collection alternative.

### 2.      Remanded CDP Hearing--Initial Communications

Petitioners' remanded CDP hearing was assigned to Settlement Officer Denise Walsh (SO Walsh) in the Appeals Office in Holtsville, New York.  She reviewed petitioners' administrative file and transcript and confirmed that the IRS properly assessed the 2013 liability and met all other requirements of applicable law and administrative procedure.  She noted that petitioners had a balance due when they requested a CDP hearing and that their balance remained outstanding.

On August 25, 2016, SO Walsh spoke to petitioners' representative by telephone and scheduled a conference call for September 15, 2016.  Petitioners' representative stated that petitioners would submit an OIC for consideration, and SO Walsh requested that they submit a completed Form 433-A, Collection

---

[4]We note that respondent's answer includes several typographical errors, but it nevertheless provides a sufficient response to the petition.

[*6] Information Statement for Wage Earners and Self-Employed Individuals.  On September 14, 2016, SO Walsh received a fax from petitioners' representative which included copies of petitioners' Form 656, Offer in Compromise, and Form 433-A.  Petitioners' OIC proposed to compromise their unpaid tax liabilities for the 2013 tax year as well as the 2001, 2003-05, 2008-12, and 2015 tax years (which at that time totaled approximately $645,314).[5]  Petitioners proposed to settle their total outstanding tax liability of $645,314 with a lump-sum payment of $12,443.  Petitioners enclosed a $2,489 check at the time of submission, representing a 20% downpayment, with the remaining balance payable within five months of acceptance.  Petitioners premised their OIC on doubt as to collectibility.

During the conference call held on September 15, 2016, SO Walsh decided that petitioners' OIC would be considered first by the IRS' OIC unit.  She suspended the remanded CDP hearing until the OIC unit completed its review.

### 3.  Evaluation by OIC Offer Specialist

Petitioners' OIC was assigned to an offer specialist in the OIC unit, Revenue Officer Chris Pugh (RO Pugh or offer specialist), for evaluation.  During the review of petitioners' OIC, RO Pugh considered all of petitioners' claimed

---

[5]The record includes different figures to refer to petitioners' total outstanding tax liability.  For simplicity, throughout this opinion we refer to petitioners' total outstanding tax liability as $645,314.

[*7] income sources and necessary living expenses. He used an average of petitioners' taxable income from the immediate past three years (2013, 2014, and 2015) as reported on their income tax returns, and determined that their average monthly income was $20,988. In contrast, petitioners claimed a monthly income of $7,068 on their Form 433-A.

RO Pugh determined that petitioners' necessary monthly living expenses totaled $5,838, rather than the $9,230 they claimed. He disallowed petitioners' claimed secured debts of $3,098 as unsubstantiated and allowed only $50 for life insurance rather than the claimed $344. RO Pugh allowed $500 for petitioners' tax expense. He also reviewed petitioners' assets and equity and determined that they had artwork with a net realizable equity of $20,000 and vehicles with a net realizable equity of $3,334.

RO Pugh found that petitioners formed, owned, and operated their own business entities throughout their careers. Despite owning and operating Siebert Corp. and Siebert Consulting, petitioners did not provide RO Pugh with adequate proof of income and expenses from the businesses. RO Pugh also noted that some of the bank deposits from the Siebert Consulting account were from a personal account.

[*8]  RO Pugh noted that petitioners failed to comply with a previously granted IA entered in 2014.  In that IA, petitioners agreed to pay $2,000 per month for 12 months to allow time for them to adjust their expenses and to pay $10,071 per month thereafter.  No payments of $10,071 were received by the IRS.  RO Pugh commented that petitioners instead filed the OIC.  He remarked that it appeared to him that petitioners made estimated payments only to keep alive their hopes of securing approval of an OIC.

RO Pugh documented that Mr. Siebert's Social Security income of $2,300 per month was being paid to his brother for an alleged unsecured loan.  He stated that this seemed to be clear verification of petitioners' ability to pay at least the amount of Mr. Siebert's Social Security check towards their outstanding tax liability.

RO Pugh observed that Mr. Siebert had sold his partnership interest for $171,546 in 2015 and that the proceeds from the sale of the partnership interest were not used to pay petitioners' outstanding tax liability.  RO Pugh also remarked that petitioners had previously agreed to use the proceeds from a section 401(k) account (section 401(k) account) to pay a portion of their outstanding tax liability.  He determined that in 2015 petitioners had dissolved the section 401(k) account with a value of $151,000, yet the IRS did not receive any payments from the

[*9] proceeds. RO Pugh noted that petitioners did not report the income from the liquidation of the section 401(k) account on their 2015 tax return.

RO Pugh asked petitioners to substantiate the expenses they paid with the proceeds from the section 401(k) account. In their response to respondent's motion for summary judgment, petitioners argue that they submitted documentation to RO Pugh on January 16, 2017, to show that the proceeds from the section 401(k) account and the sale of Mr. Siebert's partnership interest were used primarily for ordinary and necessary living expenses. After reviewing the documentation, RO Pugh concluded that petitioners did not adequately show that any of the submitted payments were directly traceable to the proceeds from the section 401(k) account. RO Pugh noted that the expenses petitioners submitted were payments to creditors for landscaping, legal fees, security, insurance payments, State of Maryland tax payments, and payments of personal loans. RO Pugh determined that the funds were not used for ordinary and necessary living expenses nor were the expenses categorized as debts that had priority over a Federal income tax liability.

With respect to the sale of Mr. Siebert's partnership interest, petitioners did not provide RO Pugh with proof of expenses that were paid with funds from the sale. RO Pugh included both the proceeds from the section 401(k) account and the

[*10] sale of the partnership as dissipated assets in the calculation of petitioners' assets and equity to determine petitioners' reasonable collection potential (RCP).

RO Pugh determined that petitioners had $345,880 of assets that could be used to pay their outstanding tax liability. He calculated that petitioners' RCP was $2,012,380. He concluded that petitioners' RCP was full payment of their outstanding tax liability and recommended rejection of their OIC as not in the best interest of the Government.

RO Pugh explained his reasoning in a narrative report. Specifically, the offer specialist indicated that petitioners had "an egregious history of noncompliance" spanning 15 years and neglected to pay their tax debts even when they had the means to do so. RO Pugh also considered that petitioners had a large outstanding tax liability. Citing Internal Revenue Manual (IRM) pt. 5.8.7.7.1(3) (Oct. 7, 2016), he observed that petitioners had failed to pay Federal income tax for the last eight consecutive years. He also observed that during the years of petitioners' noncompliance, they lived in a home valued at $4 million and paid large expenses associated with their lifestyle.

RO Pugh remarked that petitioners were educated and competent individuals. He indicated that Mr. Siebert has a high upside for potential increases in income, despite his age, on the basis of prior evidence of his ability to earn. He

[*11] wrote that after 15 years of noncompliance, petitioners then claimed their ability to earn had crashed, which timely coordinated with the submission of an OIC.

RO Pugh concluded that acceptance of petitioners' offer to pay $12,443 to settle their outstanding tax liability of $645,314 would be grossly unfair to taxpayers who may have sacrificed a certain lifestyle to remain in compliance. He discussed his findings with petitioners' representative by telephone on February 13, 2017. Petitioners received a letter dated April 12, 2017, informing them that the OIC unit's preliminary decision was to reject their proposed OIC because acceptance of the offer was not in the best interest of the Government. The letter also informed them that the final determination would be made by the Appeals Office during the CDP hearing.

4.    Remanded Hearing--Additional Communications

Before receipt of the April 12, 2017, letter, petitioners' representative notified SO Walsh of the OIC unit's preliminary decision and requested that petitioners' account be placed in CNC status. Petitioners' representative premised this request on the income reported on petitioners' 2016 tax return, which reflected monthly income of $3,542. Because this amount was less than the monthly

[*12] allowable expenses of $5,838, petitioners' representative argued that petitioners had no disposable income to pay toward their outstanding tax liability.

SO Walsh received the OIC file from RO Pugh on April 19, 2017. She reviewed the OIC, the offer specialist's narrative report, and the case history. On May 17, 2017, SO Walsh and petitioners' representative discussed the proposed OIC and RO Pugh's calculations. Petitioners again did not challenge their underlying liability for the 2013 tax year during the CDP hearing.

Petitioners disagreed with RO Pugh's method of calculating their average monthly income. Specifically, they objected to RO Pugh's use of their taxable income from the tax years 2013, 2014, and 2015, which resulted in an average monthly income of $20,988. Petitioners proposed using their adjusted gross income from 2015 and 2016, resulting in an average monthly income of $4,409. SO Walsh determined that petitioners' proposal was calculated using only their taxable Social Security income rather than the full amount of income received. SO Walsh reviewed RO Pugh's work on petitioners' case and decided to continue generally with RO Pugh's approach.

In reviewing the calculation of petitioners' average monthly income and expenses, SO Walsh determined that RO Pugh incorrectly included a one-time individual retirement account distribution from 2014. She recalculated

**[\*13]** petitioners' average monthly income to be $10,905, instead of $20,988. She

accepted the allowed expenses of $5,838, as calculated by RO Pugh. Accordingly,

SO Walsh determined that petitioners' monthly disposable income was $5,067

after allowing monthly expenses ($10,905 – $5,838). She calculated that

petitioners' future income value was $557,370. SO Walsh also recalculated

petitioners' equity in assets to be $349,331. She lowered the potential collection

amount from petitioners' artwork and vehicles. But SO Walsh continued to

include the proceeds from the section 401(k) account and the sale of the

partnership interest, which were dissipated in 2015. SO Walsh determined that

petitioners' RCP was $906,701 ($557,370 + $349,331).

On May 22, 2017, petitioners' representative faxed SO Walsh a letter in

which petitioners again disputed the method by which the OIC unit and Appeals

calculated their average monthly income. Petitioners' representative argued that

petitioners' decrease in income was permanent and disagreed with the calculation

of petitioners' tax expense. SO Walsh requested that petitioners' representative

provide her with a calculation of the tax expense. She did not receive it. Rather,

petitioners' representative proposed a monthly IA of $1,000 on the basis of

petitioners' 2016 gross monthly income and monthly allowable expenses.

[*14] SO Walsh prepared Form 14559, Appeals Offer in Compromise Memorandum (OIC Memo). Although SO Walsh calculated petitioners' RCP as higher than petitioners' proposed OIC, she did not recommend rejection on this ground. Instead she upheld the rejection of petitioners' proposed OIC as not in the best interest of the Government.

In the OIC Memo, SO Walsh noted that there was equity in petitioners' artwork, the value of which they did not include in their offer. She referenced RO Pugh's observation that Mr. Siebert was paying his Social Security benefit of $2,300 to his brother for an alleged unsecured loan. SO Walsh rejected the proposed IA of $1,000 per month because her financial analysis determined that petitioners had a greater ability to pay.

On June 26, 2017, SO Walsh informed petitioners' representative of her decision to reject the OIC as not in the best interest of the Government. On August 17, 2017, Appeals issued the supplemental notice of determination, which sustained the proposed levy. The supplemental notice of determination indicated that SO Walsh verified that all requirements of applicable law and administrative procedure had been met.

In the supplemental notice of determination, Appeals concurred with the OIC unit that petitioners' OIC should be rejected because it was not in the best

**[*15]** interest of the Government.  This decision was based on:  (1) petitioners' "egregious compliance history"; (2) petitioners' high income and commensurate lifestyle; combined with (3) petitioners' failure to turn over funds that would have been available to pay delinquent tax.  Appeals repeated the observation that petitioners' noncompliance spanned 15 years, including the last 8 consecutive years in which they had not paid Federal income tax.  Appeals also noted that petitioners' outstanding tax liability when they submitted their OIC was $645,314.  Appeals stated in the supplemental notice of determination that petitioners were high-income earners who enjoyed a commensurate lifestyle during the period in which their tax was not paid, yet they neglected to pay tax even when they possessed the means to do so.  In the notice, Appeals reviewed the prior instances in which the IRS had reached agreements with petitioners for payment of their tax liabilities but did not receive payment.

The notice ended with a balancing analysis in which Appeals rejected petitioners' OIC as not in the Government's best interest and rejected the proposed IA, which called for a monthly payment of $1,000 because Appeals' financial analysis determined that petitioners had a greater ability to pay.  Appeals concluded that the proposed levy action balanced the need for efficient collection

**[*16]** of tax with petitioners' concern that collection be no more intrusive than necessary.

On March 13, 2018, petitioners submitted financial information to Appeals in which they proposed an IA of $2,500 per month.

## Discussion

### I.    Summary Judgment Standard

The purpose of summary judgment is to expedite litigation and avoid an unnecessary (and potentially expensive) trial. Fla. Peach Corp. v. Commissioner, 90 T.C. 678, 681 (1988). Summary judgment may be granted where there is no genuine dispute of material fact and a decision may be rendered as a matter of law. Rule 121(b); see Sundstrand Corp. v. Commissioner, 98 T.C. 518, 520 (1992), aff'd, 17 F.3d 965 (7th Cir. 1994). In deciding whether to grant summary judgment, we construe factual materials and inferences drawn from them in the light most favorable to the nonmoving party. Sundstrand Corp. v. Commissioner, 98 T.C. at 520. The nonmoving party may not rest upon the mere allegations or denials in its pleadings but must set forth specific facts showing that there is a genuine dispute for trial. Rule 121(d); see Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986).

[*17] We have reviewed respondent's motion for summary judgment, petitioners' response, respondent's reply, and all of the documents submitted in support of these filings. We are satisfied that we may decide this case on summary judgment and that, for the reasons detailed below, respondent is entitled to a decision as a matter of law with respect to the collection action at issue.

II.    Standard of Review

Petitioners do not challenge the validity or amount of their underlying Federal income tax liability for 2013. Therefore, we will review Appeals' determination for abuse of discretion. See Goza v. Commissioner, 114 T.C. 176, 182 (2000); see also Sego v. Commissioner, 114 T.C. 604, 610 (2000). When we remand a case to the Appeals Office, and it returns to us after a supplemental determination is issued, we review the supplemental determination. Hoyle v. Commissioner, 136 T.C. 463, 467-468 (2011), supplementing 131 T.C. 197 (2008).

An abuse of discretion exists when a determination is arbitrary, capricious, or without sound basis in fact or law. See Murphy v. Commissioner, 125 T.C. 301, 320 (2005), aff'd, 469 F.3d 27 (1st Cir. 2006); Woodral v. Commissioner,

**[\*18]** 112 T.C. 19, 23 (1999).[6]  In considering a taxpayer's qualification for a collection alternative, such as an IA, a settlement officer does not abuse her discretion by relying on guidelines set forth in the IRM.  See Orum v. Commissioner, 123 T.C. 1, 13 (2004), aff'd, 412 F.3d 819 (7th Cir. 2005); Margolis-Sellers v. Commissioner, T.C Memo. 2019-165, at \*40; Aldridge v. Commissioner, T.C. Memo. 2009-276, 2009 WL 4282048, at \*5.  We do not substitute our own judgment for that of the Appeals officer; i.e., we do not conduct an independent determination of what would be an acceptable collection alternative.  See, e.g., Johnson v. Commissioner, 136 T.C. 475, 488 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013).

Rather, in reviewing the settlement officer's determinations for abuse of discretion, we consider whether she:  (1) properly verified that the requirements of applicable law or administrative procedure have been met, (2) considered any relevant issues petitioners raised, and (3) considered whether any proposed collection action balances the Government's need for the efficient collection of taxes with petitioners' legitimate concern that any collection action be no more

---

[6]A decision based on an erroneous view of the law or a clearly erroneous assessment of facts would constitute an abuse of discretion.  Keller v. Commissioner, 568 F.3d 710, 716 (9th Cir. 2009) (citing Fargo v. Commissioner, 447 F.3d 706, 709 (9th Cir. 2006), aff'g T.C. Memo. 2004-13), aff'g in part T.C. Memo. 2006-166, and aff'g in part, vacating in part decisions in related cases.

[*19] intrusive than necessary.  See sec. 6330(c)(3); Sego v. Commissioner, 114 T.C. at 609.  Our review of the record establishes that SO Walsh satisfied all three of these requirements.

## III.  OIC

### A.  Not in the Best Interest of the Government

In their response to respondent's motion for summary judgment, petitioners challenged SO Walsh's decision to reject their OIC.  The Secretary can compromise an outstanding tax liability on three grounds:  (1) doubt as to liability, (2) doubt as to collectibility, or (3) the promotion of effective tax administration.  See sec. 7122(a); sec. 301.7122-1(b), Proced. & Admin. Regs.  The Secretary may execute a compromise based on doubt as to collectibility--the ground that petitioners advanced in their OIC--in situations in which the taxpayer's assets and income are less than the full amount of the tax liability.  See sec. 301.7122-1(b)(2), Proced. & Admin. Regs.

Generally, an OIC based on doubt as to collectibility will be accepted if it is unlikely that the tax can be collected in full and the offer reasonably reflects the amount the IRS could obtain through other means.  See Rev. Proc. 2003-71, sec. 4.02(2), 2003-2 C.B. 517, 517.  The Commissioner created guidelines for settlement officers to follow when evaluating OICs.  See id. sec. 2.02.  Generally,

[*20] the Commissioner will reject an offer based on doubt as to collectibility when the taxpayer's RCP exceeds the amount he proposes to pay, absent a showing of special circumstances. See id. sec. 4.02(2); see also Johnson v. Commissioner, 136 T.C. at 486.

We judge the settlement officer's determination on the ground that Appeals relied upon. See SEC v. Chenery Corp., 332 U.S. 194, 196 (1947); see also Antioco v. Commissioner, T.C. Memo. 2013-35, at *25. In this case the supplemental notice of determination explains that petitioners' OIC was rejected because its acceptance would not be in the best interest of the Government.

The Commissioner may reject an OIC as not being in the best interest of the Government in certain circumstances. See IRM pt. 5.8.7.7.1(1) (Oct. 7, 2016); see also Hauptman v. Commissioner, 831 F.3d 950 (8th Cir. 2016), aff'g T.C. Memo. 2014-214; Elkins v. Commissioner, T.C. Memo. 2020-110, at *23. The IRS may consider public policy and tax administration concerns when evaluating whether an offer is acceptable. See IRM pt. 5.8.7.7.1. Reasons for rejection under these IRS guidelines include a taxpayer's "egregious history of past noncompliance, as evidenced by the taxpayer's failure to report all of their income on recent tax years and by failing to pay the tax liability when they had the means to do so." See id. at (3). Rejection of an OIC as not in the best interest of the Government is not an

[*21] abuse of discretion if Appeals has considered all of the facts and circumstances of the case and its reasoning is thoroughly explained in the notice of determination. Hauptman v. Commissioner, at *20-*22 (citing Bennett v. Commissioner, T.C. Memo. 2008-251, and Oman v. Commissioner, T.C. Memo. 2006-231); sec. 301.7122-1(c)(1), Proced. & Admin. Regs.

SO Walsh sustained RO Pugh's rejection of petitioners' OIC as not in the best interest of the Government. See IRM pt. 5.8.7.7.1. In the supplemental notice of determination, Appeals echoed RO Pugh's finding that petitioners had an egregious history of noncompliance coupled with their failure to pay income tax when they had the means to do so. Appeals observed that petitioners' noncompliance spanned 15 years, including the last 8 consecutive years during which petitioners had not paid Federal income tax. Appeals noted that petitioners' outstanding tax liability when they submitted their OIC was $645,314.

Appeals also stated in the supplemental notice of determination that petitioners were high-income earners who had enjoyed a commensurate lifestyle during the period in which their tax was not paid yet had not turned over funds that would have been available to pay delinquent tax. Finally, Appeals reviewed prior instances in which the IRS had reached agreements with petitioners for payment of their tax liabilities but did not receive payment. Considering the above

[*22] factors, Appeals' reasoning for the rejection of petitioners' OIC is thoroughly explained in the supplemental notice of determination. We now consider whether Appeals considered all of the facts and circumstances of petitioners' case.

### B. Petitioners' Arguments

Petitioners argue that Appeals did not review and consider the documentation they provided. Specifically, they allege that RO Pugh and SO Walsh incorrectly calculated their average monthly income and that RO Pugh improperly included dissipated assets in the calculation of RCP. We will review each argument in turn.

### 1. Future Income

The IRM defines the calculation of future income as an estimate of the taxpayer's ability to pay based on an analysis of gross income less necessary living expenses for a specific number of months into the future. IRM pt. 5.8.5.20(1) (Sept. 30, 2013). If a taxpayer is unemployed for a long period, then the offer specialist should not average the income. Id. at (4). But, "[i]f there is a verified expectation the taxpayer will be securing employment then the use of anticipated future income may be appropriate. Anticipated future income should not be used in situations where the future employment is uncertain." Id. If a taxpayer has a

[*23] fluctuating income, then the offer specialist should use the average earnings over the prior three years to calculate future income.  Id.  The offer specialist should generally use the three-year average except when specific circumstances are present.  Id.

Petitioners argue that RO Pugh and SO Walsh erred in using the three prior years of income to calculate their future income.  Petitioners emphasize that they are septuagenarians and insist that the decrease in their joint income is permanent.  They argue, therefore, that RO Pugh should have used only petitioners' previous two years of income (2015 and 2016) to calculate their future income.

Although the IRM does not have the force of law, a settlement officer does not abuse his discretion if he follows the guidelines set forth in the IRM.  See Orum v. Commissioner, 123 T.C. at 13; Margolis-Sellers v. Commissioner, at *40; Aldridge v. Commissioner, 2009 WL 4282048, at *5.  RO Pugh noted in his memorandum that while earning large sums of money, petitioners had disregarded their outstanding tax liability, including tax for the last eight consecutive years, which was unpaid.  He also observed that directly following 15 years of ongoing noncompliance, petitioners claimed their ability to earn had crashed to timely coordinate with the submission of an OIC.  RO Pugh also noted that despite his age, Mr. Siebert has a high upside for potential income increases according to the

[*24] prior evidence of his ability to earn. In accordance with the IRM's guidance for situations in which a taxpayer has fluctuating income, RO Pugh used petitioners' previous three years of income to calculate their future monthly income. See IRM pt. 5.8.5.20(4).

SO Walsh reviewed RO Pugh's work and decided to continue to calculate petitioners' future income by averaging their income from the previous three years. The record establishes that SO Walsh followed the guidelines set forth in IRM pt. 5.8.5.20(4). We therefore conclude that SO Walsh did not abuse her discretion in her calculation of petitioners' future income.

### 2. Dissipated Assets

Petitioners further contend that RO Pugh erroneously included a distribution from the section 401(k) account and the proceeds from the sale of a partnership interest in his calculation of petitioners' assets and equity to determine their RCP. RO Pugh included these items in the calculation of petitioners' RCP as "dissipated assets". When Appeals issued the supplemental notice of determination, IRM pt. 5.8.5.18(1) (Sept. 30, 2013) stated:[7]

---

[7]We quote the provisions as in effect when Appeals made the determination under review here. See Johnson v. Commissioner, 136 T.C. 475, 486 n. 12 (2011), aff'd, 502 F. App'x 1 (D.C. Cir. 2013).

**[\*25]** Inclusion of dissipated assets in the calculation of the reasonable collection potential (RCP) is no longer applicable, except in situations where it can be shown the taxpayer has sold, transferred, encumbered or otherwise disposed of assets in an attempt to avoid the payment of the tax liability or used the assets or proceeds (other than wages, salary, or other income) for other than the payment of items necessary for the production of income or the health and welfare of the taxpayer or their family, after the tax has been assessed * * *

Inclusion of a dissipated asset as part of the RCP determination is not automatic, and such inclusion must be clearly justified in the case activity record. IRM pt. 8.23.3.3.2.4(2) (Oct. 15, 2014). If taxpayers can substantiate the claim that the dissipated assets were necessary for the production of income or the health and welfare of taxpayers or their family, those assets should not be included in the calculation of RCP. IRM pt. 5.8.5.18(1). The offer specialist generally considers a three-year look-back period, including the year in which the offer was submitted, to determine whether it is appropriate to include a dissipated asset in the calculation of RCP. Id. at (2). The taxpayer must be able to provide a reasonable accounting of the dissipated asset. IRM pt. 8.23.3.3.2.4(2).

Petitioners submitted their request for an OIC on September 14, 2016. Under the three-year look-back period provided in the IRM, the offer specialist was permitted to consider petitioners' disposition of their assets in 2016, 2015, and 2014 to determine whether it would be appropriate to include a dissipated

[*26] asset in the calculation of RCP. Petitioners argue that they submitted information on January 16, 2017, to show that the funds from the section 401(k) account and Mr. Siebert's partnership interest were used primarily for ordinary and necessary living expenses, but RO Pugh failed to consider such expenses.

The record shows that petitioners promised to use the funds from the section 401(k) account to pay some of their then-outstanding tax liability, but after the section 401(k) account was liquidated, the proceeds were not provided to the IRS. When petitioners dissolved the section 401(k) account in 2015 and received $151,000 from it, they did not report that income on their tax return for the 2015 tax year.[8] The administrative record includes documentation from RO Pugh's notes which indicates that he reviewed the information that petitioners provided regarding the proceeds of the section 401(k) account. RO Pugh determined that the expenditures were not traceable to the proceeds of the section 401(k) account, the expenses were not ordinary and necessary living expenses, and the expenses were not debts that had priority over petitioners' Federal income tax liability. Under these facts, we find no abuse of discretion in RO Pugh's inclusion of the

---

[8]These events occurred after their 2013 tax liability had been assessed. See supra pp. 3, 8-9, 13.

[*27] liquidated section 401(k) account as a dissipated asset in his calculation of petitioners' RCP.  See IRM pt. 5.8.5.18(1).

The record also shows that Mr. Siebert sold his partnership interest in August 2015 for $171,546.  Although inclusion of a dissipated asset in a taxpayer's RCP is not automatic, the record shows that RO Pugh justified, in his case file, his decision to treat the proceeds of the sale of Mr. Siebert's partnership interest as a dissipated asset.  See IRM pt. 8.23.3.3.2.4(2).  As discussed above, the administrative record shows that RO Pugh reviewed all of the information that petitioners provided regarding the dissipated assets.  Though taxpayers must be able to provide a reasonable accounting of the dissipated asset, petitioners did not adequately substantiate the expenses they paid from the proceeds from the sale of Mr. Siebert's partnership interest or show that they were used for ordinary and necessary living expenses.  See id. pts. 8.23.3.3.2.4(2), 5.8.5.18(1).  On this record we find no abuse of discretion with regard to RO Pugh's inclusion of Mr. Siebert's partnership interest as a dissipated asset in his calculation of petitioners' RCP.  See IRM pt. 5.8.5.18(1).

The record establishes that SO Walsh considered all of the facts and circumstances in the documents petitioners submitted and thoroughly reviewed RO Pugh's work.  See Bennett v. Commissioner, T.C. Memo. 2008-251; sec.

[*28] 301.7122-1(c)(1), Proced. & Admin. Regs.  It further shows that SO Walsh followed the guidelines set forth in the relevant IRM provisions.  We therefore conclude that it was not an abuse of discretion for SO Walsh to include the proceeds from the section 401(k) account and the sale of Mr. Siebert's partnership interest as dissipated assets in the calculation of petitioners' RCP.

C.    OIC Conclusion

After consideration of the reasons set forth in SO Walsh's OIC Memo in conjunction with RO Pugh's documentation and the explanation in the supplemental notice of determination, we conclude that Appeals' determination to sustain the rejection of the OIC was neither arbitrary nor capricious, but to the contrary, had a sound basis in fact and law.  Appeals fully considered the facts and circumstances of petitioners' case.  Thus, we conclude that SO Walsh did not abuse her discretion in sustaining the rejections of petitioners' OIC as not being in the best interest of the Government.

IV.    IA

When petitioners learned that their proposed OIC was going to be rejected, they proposed a monthly IA which called for them to pay $1,000 per month.  Under section 6159, if a taxpayer cannot timely pay the full amount of tax due, Appeals may allow the taxpayer to pay the tax in installments if Appeals

**[\*29]** determines that such an agreement will facilitate full or partial collection of the liability. The discretion to accept or reject a taxpayer's IA lies within the discretion of the Commissioner. Thompson v. Commissioner, 140 T.C. 173, 179 (2013); sec. 301.6159-1(a), (c)(1), Proced. & Admin. Regs.

Generally, installment agreements "should reflect taxpayers' ability to pay". IRM pt. 5.14.1.4(4) (Sept. 19, 2014). Namely, the settlement officer should analyze a taxpayer's income and allowable expenses to determine the amount of disposable income the taxpayer has available for payment under an IA. Id. The settlement officer may also analyze other assets of the taxpayer that may be available to offset the balance due. Id. The IRM also provides that settlement officers are advised to analyze all relevant facts in considering acceptance of an IA, including the taxpayer's compliance history, ability to pay, and equity in assets. IRM pt. 8.22.7.5(5) (Aug. 9, 2017).

When SO Walsh received petitioners' file from RO Pugh on April 28, 2017, she reviewed petitioners' monthly income and expenses. SO Walsh accepted RO Pugh's decision to allow monthly expenses of $5,838 and determined that petitioners' disposable monthly income was $5,067. SO Walsh contrasted petitioners' disposable monthly income of $5,067 with their proposed IA payment

**[*30]** of $1,000 per month and concluded that their IA was not reasonable because they could pay more.

SO Walsh also considered that the equity in artwork was not offered towards petitioners' debt and found that petitioners' calculated disposable monthly income of $5,067 did not support a monthly IA payment of a mere $1,000. SO Walsh calculated that petitioners had total equity in assets of $349,331 and that their RCP was $906,701. SO Walsh considered petitioners' egregious compliance history and Mr. Siebert's use of his Social Security income of $2,300 to repay his brother for an unsecured loan. Accordingly, SO Walsh rejected petitioners' request for an IA.

Petitioners argue that they submitted a complete financial packet to Appeals on March 13, 2017, in which they requested an IA of $2,500 per month. Petitioners allege that the information they submitted was not reviewed, considered, or denied by Appeals. However, the record shows that this financial information was submitted on March 13, 2018, not March 13, 2017. As the supplemental notice of determination was issued on August 17, 2017, these documents are not relevant to the case at hand.

The explanation in the supplemental notice of determination establishes that SO Walsh adequately reviewed and considered petitioners' circumstances in the

[*31] process of making her determination. Thus, petitioners failed to show that the determination to reject their proffered IA was arbitrary, capricious, or without sound basis in fact or law. On the record before us, we hold that SO Walsh did not abuse her discretion in declining petitioners' proposed IA.

## V. CNC Status

Petitioners' representative made a request for CNC status, supported with a copy of petitioners' 2016 tax return, after they were notified that Appeals intended to deny their request for an OIC. CNC status may be available if the taxpayer can demonstrate that, on the basis of his assets, equity, income, and expenses, he has no apparent ability to make payments on the outstanding tax liability. See Foley v. Commissioner, T.C. Memo. 2007-242, 94 T.C.M. (CCH) 210, 212 (2007); IRM pt. 5.16.1.2.9 (Aug. 25, 2014). Under the IRM, an account should not be placed in CNC status if the taxpayer has income or equity in assets and enforced collection of the income or assets would not cause hardship. See IRM pt. 5.16.1.2.9(1). A settlement officer calculates a taxpayer's ability to make payments by determining the excess of income over necessary living expenses. Rosendale v. Commissioner, T.C. Memo. 2018-99, at *9.

Petitioners' 2016 tax return reflected monthly income of $3,542. As this amount was less than the monthly allowable expenses of $5,838, petitioners'

[*32] representative argued that petitioners had no disposable income to pay toward their outstanding tax liability and should therefore qualify for CNC status. Because SO Walsh determined that petitioners' disposable monthly income was $5,067, that they had equity in assets of $349,331, and that their RCP was $906,701, she apparently concluded that petitioners could make payments.[9] Under these circumstances we conclude it was not an abuse of discretion for SO Walsh to decide that petitioners failed to qualify for CNC status.

In addition petitioners do not properly raise the argument that SO Walsh abused her discretion by declining to approve their request for CNC status. Rule 121(d) provides:

> When [as here] a motion for summary judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of such party's pleading, but such party's response, by affidavits or declarations or as otherwise provided in this Rule [i.e., "the pleadings, answers to interrogatories, depositions, admissions, and any other acceptable materials", Rule 121(b)], <u>must set forth specific facts showing that there is a genuine dispute for trial</u>. If the adverse party does not so respond, then a decision, if appropriate, may be entered against such party. [Emphasis added.]

---

[9]Although the notice of determination does not make an explicit determination as to this issue, the record establishes that SO Walsh properly determined that enforced collection of petitioners' income or assets would not cause hardship.

[*33] By order of the Court dated October 23, 2018, petitioners' first response to respondent's motion for summary judgment was stricken from the Court's record. In an order dated September 28, 2018, we had explained that petitioners had not set forth specific facts showing that there is a genuine dispute of material fact for trial. Petitioners' (second) response, filed October 9, 2018, stated only that they requested CNC status and provided, among other things, a copy of their 2016 tax return. Petitioners did not put forth any arguments regarding their request for CNC status.

As we stated in our September 28, 2018, order, "[w]e are confident that counsel did not intend to put upon the Court the task of comparing petitioners' response to respondent's motion, discerning the factual differences, and then studying the Commissioner's exhibits to find support for petitioners' contrary assertions." As they did not set forth a specific dispute of material facts regarding their request for CNC status, we conclude that petitioners conceded that issue.

## VI.   Conclusion

There are no disputes of material fact, and judgment may be rendered as a matter of law. Finding no abuse of discretion in any respect, we will grant summary judgment for respondent and sustain the proposed levy to collect petitioners' unpaid income tax for the 2013 tax year. We have considered all of

**[*34]** the arguments made by the parties and, to the extent they are not addressed herein, we deem them to be moot, irrelevant, or without merit.

To reflect the foregoing,

<u>An appropriate order and decision will be entered</u>.